No. 24-1946 and 24-1951 (Consolidated)

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

UNITED STATES STEEL CORPORATION,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*
*Respondents*.

On Petition for Review of an Agency Action
of the United States Environmental Protection Agency

**Petitioner's Motion to Stay**

John D. Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, Ohio 44114

Kendra A. Jones
David W. Hacker
The Law Department of
United States Steel Corporation
600 Grant Street, Ste. 1800
Pittsburgh, PA 15219-2800

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................2

    I.    The Clean Air Act Requires EPA to Impose Technology-Based Standards Rooted in What Industry Has Achieved.............................2

    II.    EPA Promulgated MACT Standards to the Extent Technically Feasible in 2003 and Affirmed its Decision in 2020. .........................4

    III.    The Rule Inexplicably Abandons and Contradicts EPA's Past Findings. ..............................................................................................6

STAY STANDARD ..............................................................................................9

ARGUMENT ......................................................................................................10

    I.    Petitioner Is Likely to Succeed on The Merits...................................10

        **A.**    EPA Misinterprets its Statutory Duty. .....................................11

        **B.**    The Rule is Contrary to EPA's Own Findings ........................13

        **C.**    EPA Improperly Rejected Consideration of Centrally-Relevant Data...............................................................................15

    II.    The Rule Imposes Irreparable Harm Without a Stay..........................18

    III.    A Stay Will Not Significantly Injure Other Parties. ...........................20

    IV.    The Public Interest Lies in Granting a Stay. ......................................22

CONCLUSION...................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. National Football League*,
   640 F.3d 785 (8th Cir. 2011) ................................................................9

*State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*,
   812 F.2d 288 (6th Cir. 1987) ..............................................................9

*Cement Kiln Recycling Coalition v. EPA*,
   255 F.3d 855 (D.C. Cir. 2001) ..........................................................16

*Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*,
   467 U. S. 837 (1984) ..............................................................10, 13

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015) ............................................................17

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..............................................................13, 15

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................10

*Iowa Utils. Bd. v. FCC*,
   109 F.3d 418 (8th Cir. 1996) ......................................................9, 19

*Labrador v. Poe*,
   601 U.S. 929, Slip Op. (2024) ......................................................9, 19

*Louisiana Environmental Action Network v. EPA*,
   955 F.3d 1088 (D.C. Cir. 2020) ..........................................................6

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.*
   *Automobile Ins. Co.*, 463 U.S. 29 (1983) ........................................10

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ..............................................................15, 18

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................9, 22

ii

*Sierra Club v. EPA*,
    167 F.3d 658 (D.C. Cir. 1999) .......................................................16

*Sierra Cub v. EPA*,
    479 F.3d 875 (D.C. Cir. 2007) ......................................................13

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ........................................................19

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) .....................................................................19

*U.S. v. Mead Corp.*,
    533 U.S. 218 (2001) ................................................................10, 13

*UARG v. EPA*,
    573 U.S. 302 (2014) ......................................................................10

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health &*
    *Human Servs.*,
    985 F.3d 472 (5th Cir. 2021) ........................................................15

## Statutes and Legislative

5 U.S.C. §706(2)(A) ..............................................................................10

42 U.S.C. § 7412(c)(1) ...........................................................................2

42 U.S.C. § 7412(d)(2) ..........................................................2, 3, 11, 15

42 U.S.C. § 7412(d)(3) ............................................................2, 12, 16

42 U.S.C. § 7412(d)(6) ...........................................................................6

42 U.S.C. § 7412(f)(2) ............................................................................6

42 U.S.C. § 7412(h) ...............................................................................5

42 U.S.C. § 7602(k) ...............................................................................3

42 U.S.C. §7607(d)(9) ...........................................................................10

Clean Air Act ..............................................................................2, 5, 14

**Other Authorities**

68 Fed. Reg. 61,868 (Oct. 30, 2003)....................................................4, 5, 14, 19, 21

85 Fed. Reg. 45,476 (July 28, 2020)............................................................................6

86 Fed. Reg. 16,408 (March 6, 2024).....................................1, 11-14, 17, 18, 20-22

88 Fed. Reg. 30,917 (May 15, 2023) ..........................................................................7

EPA-HQ-OAR-2017-0664-0287 (July 7, 2023)........................................................7

H.R. 101-490, Part 1 (328).........................................................................................15

S. Rep. No. 228, 101st Cong., 1st Sess. 168-69 (1989).......................................4, 11

# INTRODUCTION

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 18, Petitioner Untied States Steel Corporation ("U. S. Steel") respectfully requests a stay of the EPA's National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore Processing, 86 Fed. Reg. 16,408 (March 6, 2024) ("Taconite MACT" or "Rule"). By EPA's own estimates, the Rule imposes unprecedented costs for little environmental benefit. Equally troubling, it imposes pollution control requirements that EPA itself previously concluded are unachievable and that, the record shows, will cause more environmental harm than benefit.

EPA felt bound to produce this illogical result by its legal interpretation of the CAA. But this interpretation has no support in the text or purpose of the Act. EPA then compounded this legal error by unjustifiably ignoring or rejecting both the agency's own past factual findings and a substantial portion of the data in the administrative record. This includes EPA's prior finding that the very emission standards EPA adopts today are unachievable, and a large body of data showing that EPA's original conclusion was right. The result is a Rule that is inconsistent with EPA's own precedent and the record.

Despite its legal infirmity, the Rule requires U. S. Steel to spend millions of dollars attempting to achieve the impossible: conducting new research to be able to invent, install, and operate pollution controls by the Rule's compliance deadline that

1

currently do not exist and that initial testing shows will be ineffective, create substantial amounts of waste, and even increase the harm from very pollutant it was intended to address.

Due to the high likelihood of success on the merits, the substantial and irreparable harm U. S. Steel must incur while judicial review is pending, and the lack of any countervailing public benefit to attempting to comply with the Rule, a stay pending judicial review is warranted. U. S. Steel petitioned EPA for a stay of the Rule on May 3, 2024 and has received no response. U. S. Steel therefore respectfully requests that this Court stay the Rule pending judicial review.

## BACKGROUND

### I. The Clean Air Act Requires EPA to Impose Technology-Based Standards Rooted in What Industry Has Achieved.

The CAA's hazardous air pollutants program ("NESHAPs"), requires EPA to identify the categories of sources that emit a HAP above certain thresholds. 42 U.S.C. § 7412(c)(1). EPA is then to establish "technology-based standards" for each pollutant. Clean Air Act Handbook § 6:1 (2023). For so-called "major sources," like those subject to the Rule, EPA's emission standards are to reflect the "maximum achievable control technology" ("MACT") for both new and existing sources, meaning they are to be "based on the degree of emission control achievable through the application of technologies that are used by the best performing sources in a given source category...." *Id.*; *see also* 42 U.S.C. § 7412(d)(2) and (3).

The CAA sets out several factors to consider in setting MACT standards. They are to "require the maximum degree of reduction in emissions" of the HAPs the source category emits "that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources...." 42 U.S.C. § 7412(d)(2).

What EPA finds "achievable" shall "not be less stringent than the emission control that is achieved in practice by the best controlled similar source." *Id.* at § 7412(d)(3). This "MACT floor" is to reflect "the average emission limitation achieved by the best performing 12 percent of the existing sources" if there are 30 or more sources in the category, and if not, "the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information)." *Id.* An "emission limitation" is defined as "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter." 42 U.S.C. § 7602(k).

Thus, by a plain reading of the statute, EPA is to identify the emission limitations for the "best performing" sources, determine which limitations are in

fact being "achieved," and then average either the best 12% of 5, depending on the number of sources available. The statute does not subsequently define what constitutes a "best performing" source, but equally, nowhere does it preclude EPA from considering the cost of controls, adverse environmental effects, or any other relevant factor, in determining what are "best performing sources" or what they have "achieved." To the contrary, the legislative history of the CAA makes clear that these terms were meant to incorporate such factors. *See* S. Rep. No. 228, 101st Cong., 1st Sess. 168-69 (1989) ("Cost considerations are reflected in the selection of emissions limitations which have been achieved in practice (rather than those which are merely theoretical) by sources of a similar type or character. An emissions limitation achieved in practice is one based on control technology that works reasonably well (doesn't require frequent and extensive modification or repair) under realistic operating conditions.")

## II. EPA Promulgated MACT Standards to the Extent Technically Feasible in 2003 and Affirmed its Decision in 2020.

EPA promulgated MACT standards for the taconite iron ore processing ("Taconite") source category in 2003. 68 Fed. Reg. 61,868 (Oct. 30, 2003). These standards contain two findings that are significant to the current Rule. First, EPA found that, while mercury is a HAP permitted by the taconite industry, there is no technically feasible way to set a numeric emission limit for mercury. *Id.* at 61,878

("There is no way to set a floor standard for mercury that is 'achievable,' as required by CAA section 112(d)(2)").

Specifically, EPA found that "[m]ercury emitted from taconite iron ore processing plants originates primarily from the ore itself" and "any differences in mercury emissions from existing indurating furnaces" simply reflects different "mercury levels in raw materials or fossil fuels used at the individual plants." *Id.* at 61,878-79. Further, "[n]one of the taconite iron ore processing plants control mercury emissions by using at-the-stack controls." *Id.* Thus, "there is no standard that can be duplicated by different sources or replicable by the same source." *Id.*

This was a permissible finding under the CAA, which expressly authorizes EPA to find that certain HAPs are not susceptible to technically feasible numeric emission limitations. 42 U.S.C. § 7412(h). In these situations, EPA "may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof." *Id.* EPA, however, chose not to impose a work practice standard for mercury in the 2003 rule.

Second, with respect to two acid gases (hydrogen chloride and hydrogen fluoride), EPA found these were also emitted by the taconite industry, but particulate matter ("PM") was a surrogate pollutant that could be monitored and controlled to effectively address acid gases from the industry. 68 Fed. Reg. at 61,884.

EPA reviewed Taconite MACT in 2020, both to determine whether any residual risk remained after implementing the 2003 MACT standards under 42 U.S.C. § 7412(f)(2) ("residual risk review") and to determine whether revisions were "necessary" to take into account "developments in practices, processes, and control technologies" since 2003 under 42 U.S.C. § 7412(d)(6) ("technology review"). 85 Fed. Reg. 45,476, 45,478 (July 28, 2020).

In its risk review, EPA found that "risks due to emissions of air toxics from this source category are acceptable and that the existing emission standards provide an ample margin of safety to protect public health and prevent, taking into consideration relevant factors, an adverse environmental effect." *Id.* at 45,478. Notably, the Rule does not question or disturb this conclusion. Thus, there is no allegation that additional mercury reductions are needed to address public health or welfare.

Regarding its technology review, "EPA did not identify any developments in practices, processes, or control technologies for affected sources subject to" Taconite MACT. *Id.*

## III. The Rule Inexplicably Abandons and Contradicts EPA's Past Findings.

In 2020, the D.C. Circuit determined that the CAA requires EPA to "address all listed air toxics the source category emits." *Louisiana Environmental Action Network v. EPA*, 955 F.3d 1088, 1091 (D.C. Cir. 2020). The *LEAN* decision did not

involve the taconite industry and makes no comment on the EPA's record findings as to what is achievable for that source category. It is also silent as to how EPA should address any particular air toxic; it simply holds that EPA must address them. The *LEAN* decision also says nothing about surrogacy, let alone comments on the validity of PM as a surrogate for acid gases.

Nonetheless, citing *LEAN*, EPA proceeded to impose numeric emission standards for mercury on the Taconite Ore Processing source category and that it would at the same time, reverse its 2003 decision to use PM as a surrogate for acid gases. 88 Fed. Reg. 30,917 at 30,920 (May 15, 2023). EPA gave no record basis for reversing its prior decision. It simply asserted it believed there were technologies that could do better than current controls and that it was going to impose numeric emission limits for mercury and acid gases. *Id.* at 30,920 and 30,923.

American Iron and Steel Institute and U. S. Steel submitted joint comments on the rule. EPA-HQ-OAR-2017-0664-0287 (July 7, 2023) ("Joint Comments"). They pointed to a substantial body of data already in EPA's possession that confirmed EPA's 2003 finding that numeric mercury standards are infeasible, both because mercury concentrations vary significantly within a mine, making any numeric standard unachievable, let alone not "achieved" by even the "best-performing" sources, and because there remained no technically feasible way to control mercury emissions. Joint Comments at 32-38; *id.* at 40-43. Commenters

also pointed out that nothing in EPA's proposal supported abandoning EPA's twice-confirmed use of PM as a surrogate for acid gases, and that doing so would result in considerable cost and technical difficulties. *Id.* at 115-126.

EPA's proposals raised significant risk of adverse environmental consequences, too. The mercury standards EPA proposed were based on the assumption that a technology used by power plants (activated carbon injection or "ACI") could be applied to taconite furnaces. This technology had never been used successfully on taconite furnaces and pilot testing had shown it creates substantial quantities of mercury-contaminated particulate waste that is more environmentally harmful than the small amount of elemental mercury vapor the technology removes. *Id.* at 52. The acid gas requirements EPA proposed, in turn, would force facilities to control pH in process water, rather than PM removal, which would require for some facilities a mind-bogglingly large increase in wastewater with no improvement in control of acid gases. *Id*. at 125-6, 132, 139-40.

In 2024, EPA promulgated the Rule. Despite express comments on both issues, EPA made no attempt to explain its position on either. Instead, EPA ignored its prior findings, finalizing numeric MACT standards for mercury as if mercury were being actively controlled by its "best performing" sources, and proceeded to impose numeric emissions limits for acid gases. The result is a mercury emission limit that has not been achieved in practice by even EPA's "best-performing"

sources, is not "achievable" by the source category, and includes acid gas limits that are inexplicably costly and burdensome.

## STAY STANDARD

Courts consider four factors in determining whether to grant a stay: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) the prospect of irreparable injury; (3) the possibility of harm to other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 423 (8th Cir. 1996).

These "four considerations are factors to be balanced and not prerequisites to be met." *State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). This Court has identified "likelihood of success on the merits" as "[t]he most important factor." *Brady v. National Football League*, 640 F.3d 785, 789 (8th Cir. 2011); *see also Labrador v. Poe*, 601 U.S. 929, Slip Op. at 3 (2024) (Kavanaugh, J., concurring) ("if the harms and equities are sufficiently weighty on both sides, the best and fairest way to decide whether to temporarily enjoin a law pending the final decision is to evaluate which party is most likely to prevail in the end"). But, as explained below, each factor favors a stay here.

**ARGUMENT**

## I.      Petitioner Is Likely to Succeed on The Merits.

Both the CAA and APA prohibit EPA from taking action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. §7607(d)(9); 5 U.S.C. §706(2)(A).  This means EPA's action must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project,* 592 U.S. 414, 423 (2021).  EPA must consider "the relevant factors" and cannot "entirely fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). Further, an agency may not adopt an interpretation "manifestly contrary to the statute." *U.S. v. Mead Corp.*, 533 U.S. 218, 227 (2001).  While under the current law of *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), EPA receives deference in interpreting ambiguous statutory provisions, EPA may not take action "incompatible with the substance of Congress' regulatory scheme." *UARG v. EPA*, 573 U.S. 302, 322 (2014) (quotations omitted).  Taconite MACT imposes requirements that EPA itself has found cannot be achieved and, even if they could, would be unreasonably costly.  This falls far short of EPA's statutory mandate to impose "achievable" standards.

EPA reached its illogical conclusion that such unachievable standards were permitted by the CAA first by misreading its obligations under the Act and then

compounded its error by refusing to recognize its own prior factual findings and the substantial body of evidence in the record that would have allowed it to mitigate the harm of it misreading the statute. The result is a triply arbitrary Rule that is inconsistent with the CAA, EPA's own findings, and the record.

## A. EPA Misinterprets its Statutory Duty.

Congress identified factors EPA "shall" consider in setting MACT emission standards under 42 U.S.C. § 7412(d)(2). These include "the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements." *Id.* The plain meaning of this mandate is that EPA must consider cost and environmental impacts in setting MACT standards.

EPA disagrees, asserting it is *required* by the CAA to ignore the consequences of its actions and to blindly set emission standards based on statistics alone. Whatever the average 12% or 5 sources do, EPA argues, must be required of all, regardless of consequences. *See* 89 Fed. Reg. at 16,414; RtC at 12. This illogical reading finds no support in the statute. While the statute references the 12% and 5 "best performing" sources, there is no objective way to select "best performing" sources, or even to determine whether an emission limitation has been "achieved," without subjectively considering what each source is in fact doing, and how. *See* S. Rep. No. 228 at 168-69 ("Cost considerations are reflected in the selection of emissions limitations which have been achieved in practice….").

Is short, while 42 U.S.C. § 7412(d)(3) provides factors EPA must consider in setting numeric emission standards under MACT, this provision neither expressly nor logically bars EPA from considering the cost and environmental impacts of the "MACT floors" it imposes. To the contrary, by requiring EPA to determine what performance is "best" and to determine what is being "achieved," the Act requires EPA to consider such factors.

Here, there is no dispute that cost and environmental impacts caution against the final Rule. EPA itself recognizes the cost of the mercury emission standards alone are unprecedented and would be unreasonable, if only EPA had considered costs. 89 Fed. Reg. at 16,410. By EPA's estimate, the Rule will cost approximately $385,000 per *pound* of mercury removed. Development of Impacts for the Final Amendments to the NESHAP for Taconite Iron Ore Processing, at 10, Table 5-3 (Jan. 29, 2024) ("Impacts Memo"). This is over ten times the highest costs EPA has found cost-effective for mercury controls for other industries. 89 Fed. Reg. at 16,414. Similarly, the Rule results in significant secondary adverse environmental impacts, including consumption of an additional 100 GWh/year, generation of almost 50,000 tons/year of additional solid waste, and creation of approximately 4 million gallons/year of wastewater, that EPA projects will be caused by the Rule. Impacts Memo at 17, Table 6-1.

Even under the deferential standard of *Chevron*, judges have already recognized that EPA's interpretation created the opportunity to run counter to common sense. *See Sierra Cub v. EPA*, 479 F.3d 875, 885 (D.C. Cir. 2007) (Williams, J. concurring) (observing that EPA's interpretation would create a statute "whose literal words produced a result so demonstrably at odds with the intentions of its drafters as to justify judicial surgery" but speculating EPA could avoid clear violation of Congressional intent through the judicious selection of categories and subcategories). Here, EPA ignored these warnings and insisted on imposing unreasonable costs and environmental risks because it insisted, contrary to the statute, that it "may not consider costs or other impacts in determining the MACT floor." 89 Fed. Reg. at 16,414. This interpretation and its result are "manifestly contrary to the statute" and arbitrary and capricious. *Mead* 533 U.S. at 227.

### B. The Rule is Contrary to EPA's Own Findings

While an agency is entitled to change its view, "it is obligated to explain its reasons for doing so." *State Farm*, 463 U.S. at 56. This starts by recognizing that the agency is in fact changing its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 504 (2009) ("an agency must ordinarily display awareness that it *is* changing position").

The Rule does not write on a clean slate. EPA already promulgated MACT standards for the taconite industry in 2003. In doing so, EPA addressed two key

facts for the current Rule. First, EPA recognized that, while mercury is emitted during taconite ore processing, there was no basis on which to set a numeric emission limit that even the best-performing sources could reliably meet because the mercury content of emissions is almost entirely governed by the mercury content of the ore taconite facilities use, which is itself highly variable and impracticable to control. 68 Fed. Reg. at 61,878-79. In other words, "[t]here is no way to set a floor standard for mercury that is 'achievable,' as required by CAA section 112(d)(2), because there is no standard that can be duplicated by different sources or replicable by the same source." *Id.* at 61,878. Second, EPA concluded that "[f]or the taconite industry, [particulate matter] can be used as a surrogate for the acid gases emission from taconite indurating furnaces." *Id.* at 61,884.

The Rule makes no mention of EPA's prior finding that mercury controls are infeasible. The most EPA does is acknowledge that comments were submitted pointing EPA to its prior findings, but EPA makes no response to these comments. RtC at 58.[1] And, while it recognizes EPA previously found that particulate matter "served as a surrogate," EPA makes no effort to explain its sudden abandonment of its position in the Rule. 89 Fed. Reg. at 16,409. EPA cannot support a new position

---

[1] EPA cites to Section III.A.2 of the preamble to the final Rule and its response to Comment 1 in Section 2.3 of the RtC for its response. *Id*. Neither of these citations mentions, let alone addresses, EPA's 2003 finding.

by ignoring its prior findings. Doing so renders its current Rule arbitrary and capricious. *FCC*, 556 U.S. at 515-16.

EPA also ignored material findings from other rules raised during public comments. For example, commenters raised that, for emissions driven by the raw materials used, as the mercury emissions in taconite processing are driven by the mercury content of the ore, EPA has recognized in other rules that there are statistical tools available to measure and incorporate that variability, which EPA failed to apply in the Rule. Joint Comments at 101-103. Commenters even did the calculations and submitted them to EPA. *Id.* at Appendices 12 and 13. Again, EPA made no response in the final Rule, failing both to treat like cases alike and consider what it had already recognized elsewhere was a relevant factor. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Human Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) ("It is a bedrock principle of administrative law that an agency must treat like cases alike") (quotations omitted); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) ("Unexplained inconsistency is…a reason for holding [agency action] to be…arbitrary and capricious").

## C. EPA Improperly Rejected Consideration of Centrally-Relevant Data.

MACT standards are, first and foremost, required to be "achievable." 42 U.S.C. § 7412(d)(2); *see also* H.R. 101-490, Part 1 (328) ("MACT is not intended to require unsafe control measures, or to drive sources to the brink of shutdown").

In setting a MACT "floor" in particular, EPA may not speculate as to what can be achieved. It must base its determination on what has been "achieved" by existing sources in the same category or subcategory. 42 U.S.C. § 7412(d)(3). This is true even under EPA's cost-blind, environmental impacts-blind approach to setting MACT floors. *See Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 860 (D.C. Cir. 2001) (stating EPA's position that 42 U.S.C. § 7412(d)(3)(A)'s use of the word "achieved" indicates the standards must be based on actual data).

A source also does not "achieve" an emission standard simply by achieving it once under favorable circumstances. A standard is "achieved" only when it is met "under the worst reasonably foreseeable circumstances." *Sierra Club v. EPA*, 167 F.3d 658, 665 (D.C. Cir. 1999). As stated in *Sierra Club*, "[i]t is reasonable to suppose that if an emissions standard is as stringent as 'the emissions control that is achieved in practice' by a particular unit, then that particular unit will not violate the standard. This only results if 'achieved in practice' is interpreted to mean 'achieved under the worst foreseeable circumstances.'" *Id.*

The data in the record shows that, under the worst circumstances experienced by current sources, no furnace or facility has met the MACT floor for new sources, and only one facility has arguably "met" the MACT floor for existing sources, purely because of the low level of mercury in the ore it was using when a single stack test was conducted. *See* Joint Comments at 36, 93, Table VII.2. Thus, even under EPA's

interpretation of the CAA, data in the record shows that the Rule has not set the MACT floors correctly.

EPA's response was not to correct the MACT floors, but to reject any consideration of the data. 89 Fed. Reg. at 16,412. This was error. EPA must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43; *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015) ("agencies do not have free rein to use inaccurate data" and "cannot ignore new and better data").

In the final Rule and response to comments, EPA raised some concerns with the data in the record, but none justified such wholesale exclusion of centrally-relevant information. For example, EPA asserted it was concerned that one of its "best-performing" facilities, Northshore, had only data from "two greenball sampling episodes: one in January 1997 and the other in November 2001." 89 Fed. Reg. at 16,412. This, EPA found, was "insufficient to evaluate temporal variability." This sounds superficially reasonable, but for the fact that EPA used *even less data* to establish the temporal variability of mercury emissions from Northshore in the Rule. *See* Final Maximum Achievable Control Technology (MACT) Analysis for Mercury Standards for Taconite Iron Ore Indurating Furnaces, at 11 (Jan. 24, 2024) ("Emissions Memo") (only a single sampling episode in 2014). Similarly, while

EPA argued that the greenball data was spread over varying intervals, ranging from "a few days to multiple years," 89 Fed Reg. at 16,412, the same is again true for the data EPA used in the Rule. *See* Emissions Memo at 11 and 13 (all Northshore data collected from a single stack test whereas data for Minntac collected between 2015 and 2022). Such double standards are the essence of arbitrary and capricious rulemaking. *See Brand X*, 545 U.S. at 981.

Equally problematic, in rejecting this data set, EPA also threw out any consideration of the fundamental issues commenters had raised with EPA's Rule and used the greenball data to illustrate. For example, commenters noted that EPA had established a procedure for incorporating raw material variability into an emissions limit. Joint Comments at 101-103. They even provided the calculations to establish a similar raw material variability factor for the Rule. *Id.* at Appendices 12 and 13. Even if EPA had legitimate objections to some of the data in the record, which it does not, this is not a license to entirely ignore significant aspects EPA has already recognized are significant and that EPA has already developed tools to address in other rules. Doing so also renders the Rule arbitrary and capricious. *See State Farm*, 463 U.S. at 46-51.

## II. The Rule Imposes Irreparable Harm Without a Stay.

"In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for

equitable relief." *Iowa Utils.*, 109 F.3d at 425.  Needing to comply with an invalid regulation is itself an irreparable harm.  *Id* at 426; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) ("complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.") (Scalia, J., concurring in part and in the judgment); *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.") (citation omitted).  Further, as Justice Kavanaugh recently explained, the need for businesses to "restructure their operations or build new facilities to comply" with new environmental regulations "during the multiyear period while the legality of the regulations is being challenge in court" presents such a need.  *Labrador*, 601 U.S. 929, Slip Op. at 3 (Kavanaugh, J., concurring).

Taconite MACT imposes emission requirements for which there is no current control technology.  Bartovich Decl. at ¶¶6-7 ("Exhibit A").  EPA maintains that activated carbon injection ("ACI"), a technology "not currently used at any taconite plant," can be adapted from other industries.  RtC at 21.  But ACI has been studied for years by U. S. Steel and found infeasible.  Bartovich Decl. at ¶7.  Until recently, EPA agreed.  68 Fed. Reg. at 61,879-80 (finding no at-the-stack controls available to render a mercury emission limit achievable); *id.* at 61,880 (rejecting ACI as a

beyond-the-floor technology because of "high cost, small reduction in HAP emissions, increased energy usage, and additional waste generation").

EPA cites nothing new in the Rule; it simply requires U. S. Steel to overcome these challenges because "EPA expects a properly designed, operated, and maintained ACI system" should exist. RtC at 21. By EPA's own estimates—which industry has shown significantly underestimate the costs—even if ACI works as EPA "expects," it will cost industry approximately $106 million in capital costs and $68 million per year. 89 Fed. Reg. at 16,421. In other words, EPA is not only requiring industry to restructure its operations and build new pollution control facilities at unprecedented costs, it is requiring facilities to commit to associated disruption of their current operations, spend hundreds of millions of dollars, and risk their productive capacity and indeed ability to operate completely, to design, permit, and install a technology with no demonstrated ability to actually work.

## III.  A Stay Will Not Significantly Injure Other Parties.

EPA projects no benefit from the Rule until 2027, well after this litigation is likely to resolve. EIA at 1-7. Even then, EPA estimates the Rule will result in removal of approximately one tenth of a ton of mercury and acid gas reductions at only a single facility. 89 Fed. Reg. at 16,411 (232-247 pounds or mercury); EIA at 3-6 (showing only one facility installing controls to meet the Rule's acid gas

requirements). EPA itself did not attempt to quantify the benefit of these reductions. 89 Fed. Reg. at 16,421.

It is also unclear that attempting to comply with the Rule will result in a net environmental benefit. As noted above, EPA previously rejected ACI as a feasible control technology in part because it creates substantial adverse environmental effects. 68 Fed. Reg. at 61,880. For example, while EPA projects that the Rule will reduce sulfur dioxide emissions by 32 tons, it will *increase* sulfur dioxide emissions at power plants by 57 tons to provide the energy needed to run the new pollution control equipment. EIA at 3-9 to 3-10. Further, while EPA projects a small decrease in elemental mercury emissions of approximately 0.12 tons, multiple studies show that use of ACI *increases* particle-bound mercury, which is a more significant environmental concern. *See* RtC at 21-22. This includes the very studies EPA used to support the Rule. *Id.* (citing Minntac and Keetac pilot studies). EPA recognizes these risks, but waives them away as another technical hurdle industry will hopefully address through "high efficiency scrubbers," despite the same problem being identified with this technology. *See* Joint Comments at 37, 40. In short, even when looking only at mercury, third parties are likely better off without the Rule than with it.

## IV. The Public Interest Lies in Granting a Stay.

The interest of third parties and the public interest generally merge "when the Government is the opposing party." *Nken*, 446 U.S. at 435. Thus, as with the interest of third parties, the public interest here supports a stay.

Further, a stay will minimize costs to the public pending judicial review. While, as noted above, EPA has made no attempt to quantify the benefit of its Rule or the offsetting environmental harms, it has modeled the "total welfare" change of its rule, which "projects total welfare losses of about $49 million" in 2019 dollars. EIA at 4-11. The bulk of the costs falls on the taconite industry itself. An industry that directly employs over 5,000 people in Minnesota and Michigan, and U. S. Steel supports an additional 2,000 jobs. EIA at 2-11; Bartovich Decl. at ¶4. This highly-localized industry exists only along the Mesabi Iron Range in Minnesota and the Marquette Iron Range in the Upper Peninsula of Michigan, both areas that face high unemployment rates and poverty. *See* 89 Fed. Reg. at 16,421. The public welfare effects are not confined to the taconite industry, either. *See* EIA at 4-11 ("Consumers of U.S. steel mill products are unambiguous worse off…").

## CONCLUSION

For these reasons, Petitioner respectfully requests that this Court stay the Taconite Rule pending judicial review.

Dated: June 3, 2024                          Respectfully Submitted,

*/s/John D. Lazzaretti*
John Lazzaretti
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114
216.479.8350
John.lazzaretti@squirepb.com

Kendra A. Jones
David W. Hacker
The Law Department of
United States Steel Corporation
600 Grant Street, Ste. 1800
Pittsburgh, PA 15219-2800
Telephone:  (479) 200-9743 (Jones)
            (412) 433-2919 (Hacker)
Facsimile:  (412) 433-2964
Email:      kjones@uss.com
            dwhacker@uss.com

*Counsel for Petitioner United States
Steel Corporation*

## Certificate of Compliance

I certify that Petitioners' Motion to Stay complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 5,196 words, excluding cover page, table of contents, table of authorities, signature block, Certificate of Service and Certificate of Compliance.

I also certify that Petitioners' Motion to Stay complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Times New Roman font, using Microsoft Word in accordance with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6).

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

Dated: June 3, 2024          */s/John D. Lazzaretti*

John D. Lazzaretti

**Certificate of Service**

I certify that on June 3, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of the filing to any CM/ECF participants.

*/s/John D. Lazzaretti*
John D. Lazzaretti

***U. S. Steel v. EPA,*** **Case No. 24-1946 (consolidated with Case No. 24-1951)**

**Petitioner's Motion to Stay**

**Exhibit A**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES STEEL CORPORATION, | ) ) ) | No. 24-1946 (Consolidated with No. 24-1951) |
| Petitioner, | ) ) | |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, Administrator, United States Environmental Protection Agency, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

## DECLARATION OF CHRISSY BARTOVICH

I, Chrissy Bartovich, am over 18 years of age and make the following declaration pursuant to 28 U.S.C. § 1746:

1.  I am Senior Director – Environmental for United States Steel Corporation ("U. S. Steel") Minnesota Ore. In this role, I am responsible for environmental compliance and permitting at Minntac and Keetac. I have been employed with U. S. Steel since June 1999. As of June 2024, I will have been working at U. S. Steel for 25 years.

2.  I am submitting this declaration in support of U. S. Steel's motion to stay the United States Environmental Protection Agency's ("EPA's") National Emission Standards for Hazardous Air Pollutants: Taconite Iron Ore

Processing, 86 Fed. Reg. 16,408 (March 6, 2024) ("Taconite MACT" or "Rule"). As further explained in this declaration, the Rule imposes significant costs and imposes pollution control requirements that are unachievable and will likely have significant adverse environmental consequences.

3. This declaration is based on my personal knowledge of facts and information pertaining to U. S. Steel's business and the implications of EPA's implementation of the Rule. My knowledge is based on my history with U. S. Steel and analysis U. S. Steel has conducted of the Rule.

## I.    U. S. Steel's Role with Respect to the Rule

4. U. S. Steel has ore operations at two taconite iron ore processing facilities located on the Mesabi Iron Range:  Keetac in Keewatin, Minnesota, and Minntac in Mt. Iron, Minnesota.  These facilities began operations in 1967 and, together, the facilities have approximately 2,000 employees.

5. Based on the best information currently available, both Minntac and Keetac will be required to install post-induration pollution control technology to attempt to meet the existing source emission standard for mercury in the Rule.

## II.    Irreparable Harms from EPA's Implementation of the Rule

6. There is no post-induration pollution control technology for removal of mercury currently in use in the taconite industry and there is no pollution

control technology that has been demonstrated to be able to meet the Rule's mercury emission standards.

7. U. S. Steel has invested significant effort and money into researching mercury control strategies. These efforts include research and pilot testing of activated carbon injection ("ACI"), which is the technology EPA identifies as available to control mercury levels to meet the standards in the Rule. That testing indicated a potential for modest mercury reductions, but it also raised concerns. ACI requires injecting activated carbon into the process gas at the facility. This has a number of adverse effects. It generates large volumes of solid waste and is unclear where that waste will leave the process. It has high energy demands, requiring more electricity and associated pollution. And it alters the composition of the mercury that remains in the waste gas when it exits the facility, making it more likely to be deposited locally and more bio-available where it is deposited. Based on these results, U. S. Steel has determined that ACI is not a technically feasible control technology to meet the published limits.

8. Significant additional research and pilot testing will be required to establish whether ACI or any other post-induration mercury control technology can be adapted to reliably meet the Rule's mercury standards at Minntac and Keetac without causing significant adverse environmental and operational impacts.

9. In my opinion, the compliance deadlines in the Rule do not allow sufficient time for this research or to achieve compliance with the standard. Research alone could take the three years provided for compliance without identifying a viable control technology. Permitting in Minnesota could also result in delays beyond U. S. Steel's control that exceed the current three-year compliance period.

10. The Rule's pH monitoring requirements pose significant problems for the once-through wet scrubber systems at Minntac. There is no indication that maintaining pH is needed to achieve the acid gas limits in the Rule. Inclusion of pH management is arbitrary as this was not in place when limits were set. Yet the Rule will require Minntac to potentially treat billions of gallons of water from our clear pool reservoir to maintain pH levels, if that is even possible to occur. This is not only a waste of money and materials, it will not result in a compliance change with the acid gas limits. It could have adverse impacts on planned water treatment efforts at Minntac.

11. The Rule also does not allow sufficient time to implement the pH monitoring requirements. It is likely that the pH monitoring and associated treatment called for by the Rule will require permitting that, in my experience, can take years, making the current deadline unachievable due to circumstances beyond U. S. Steel's control.

12. If the Rule is stayed, U. S. Steel would not need to install ACI or adjust the pH of its scrubber water.

13. A stay of the Rule is necessary to avoid these unnecessary costs and waste of valuable resources.

## III. **Conclusion**

14. In my opinion, the Rule imposes unprecedented costs with little to no chance of compliance, but U. S. Steel cannot delay committing resources and incurring these costs until judicial review is complete. The Rule should therefore be stayed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on May 31, 2024.

Chrissy Bartovich
Senior Director – Environmental
United States Steel Corporation